(No. 1021—

W. S. Anderson, R. S. Berry, J. J. Dunnegan, A. W. Murphy, E. A. Reed, and E. S. Welch, Co-Partners, Doing Business as J. J. Dunnegan Construction Company, Claimant, *vs.* State of Illinois, Respondent.

*Opinion filed September 10, 1929.*

Pringle & Fearing, for claimant.

Oscar E. Carlstrom, Attorney General; S. S. DuHamel, Assistant Attorney General, for respondent.

Mr. Justice Thomas delivered the opinion of the court:

On the 14th day of June, 1923, claimants, a co-partnership doing business as J. J. Dunnegan Construction Co., entered into a contract with the State of Illinois to construct the portion of State Bond Issue Route No. 18 known as Section 12 Project No. 59 for the total sum of $161,826.10. The contract was awarded to claimants upon a bid which they had previously submitted. After their bid had been accepted claimants leased a gravel pit and installed machinery thereat for the purpose of removing and preparing the gravel for use in the construction of the work awarded them. Samples of this gravel were submitted to the State authorities having the supervision of the construction of the work and claimants were notified that it was not satisfactory.

The contract was executed and about two miles of the road were constructed before claimants began to use any gravel

from the pit they had leased, the machinery for handling the gravel at the pit not being installed ready for work until the latter part of July. After this machinery was installed claimants began using the gravel from this pit. Soon after they began to use this gravel the State inspectors discovered that it was unsuitable and did not meet the requirements of the specifications. In an endeavor to make it comply with the specifications changes in the method of treating it were made but were unsuccessful. On August 28, 1923, after 3,835 linear feet of pavement had been constructed with it, the State officials notified claimants that no more of that gravel would be accepted as it was not of the kind and quality required by the specifications. Claimants then quit using gravel from that pit and finished the work with gravel procured from other sources, and when it was completed were paid in accordance with the terms of their contract.

Claimants have filed this suit against the State for $21,-954.58 damages, which sum they allege represents the difference in the actual cost of completing the work under their contract and what the actual cost would have been had the gravel from this pit been accepted by the State.

The contract of claimants with the State is attached to the declaration and made a part thereof. This contract provides: "That for and in consideration of the payments and agreements mentioned in the proposal hereto attached to be made and performed by the party of the first part, and according to the terms expressed in the bond referring to these presents, the party of the second part agrees with said party of the first part at his own proper cost and expense to do all the work, furnish all materials, and all labor necessary to do the work in accordance with the plans and specifications hereinafter described, and in full compliance with all specifications hereinafter described, and in full compliance with all of the terms of this agreement and the requirements of the engineer under it. And it is also understood and agreed that the Notice to Contractors, Proposal, Bond, Specifications, and Plans hereto attached or hereinafter referred to, are all essential documents of this contract and are a part hereof." To this contract is attached the Notice to Contractors, the Proposal of Claimants, and the Specifications for the work. The specifications provide that tests of material samples shall be made by the Division of Highways of.the Department of Public

Works and Buildings, that samples of materials may be taken by the Inspectors of the Division of Highways from time to time, that the contractor shall furnish such samples when requested by the Inspectors, and that "the approval of preliminary samples shall not be considered as a guarantee of acceptance of all materials from the same source, and it shall be understood that all materials delivered on the work and which do not meet the requirements of these specifications may be rejected by the engineer." The specifications further provide that the Inspector shall see that the provisions of the contract and specifications are fulfilled by the Contractor and, in case they are not, report the same to the Engineer; that instructions given the contractor by the Inspector shall in no wise be construed as releasing the contractor from the proper fulfillment of the terms of the contract as determined by the Engineer; that the Engineer shall act as referee in all questions arising under the contract between the parties and his decision shall be final and binding upon both; that insufficient, imperfect or damaged work or material when pointed out to the contractor by the Engineer shall be immediately remedied and made good or removed and replaced to conform to the plans and specifications; that the ommission of the Engineer to disapprove or reject defective work or material during construction shall not be deemed an acceptance of such work or material nor be construed as in any way releasing the contractor from making good any defective work or material so as to conform to the plans and specifications; and that "it is understood by the contractor that the compensation as provided in the contract is accepted as full payment for furnishing of materials, labor, tools and equipment and for performing the work contemplated and embraced under the contract; also, for all loss or damages arising out of the nature of the work or from the action of the elements, or from any unforeseen difficulties or obstructions which may arise or be encountered during the prosecution of the work, and for all risks of every description connected with the prosecution of the work; also for any expense incurred by or in consequence of the suspension or discontinuance of said work as herein specified, or for any infringement of patent, trade-mark or copyright." The specifications provide the payment shall be of concrete and that the coarse aggregate of the concrete shall consist of particles of clean,

hard, tough, durable rock in the form of either gravel or crushed material and shall contain no shale, slate, coal, ochre or other materials which easily disintegrate, shall be free from vegetable or other deleterious matter and contain no soft, thin or elongated pieces; that gravel used for coarse aggregate shall show high resistance to abrasion, and no gravel which in the opinion of the Engineer does not show wearing qualities at least equal to crushed stone having a French coefficient of wear of 6 shall be used.

These provisions of the contract were all known to claimants long before they leased the gravel pit. In their bid or proposal they recite they have examined the specifications, including all special provisions, and form of contract, and are thoroughly familiar with them. Having executed this contract with these provisions in it they are bound by them.

When claimants began to use the gravel from the pit they had leased it developed that it had ochre and clay balls in it, that it was too soft and not of the quality required by the specifications. The State officials permitted claimants to endeavor to remove the objections to the gravel and various plans were tried in their endeavor to do so, but none of them was successful. That went on till after the middle of August. Finally the Chief Highway Engineer, Mr. Older, went out to the place and examined the paving work already done and the gravel being used from the pit. After this examination and a consultation with the assistant engineers the Chief Engineer had claimants notified the gravel was unsuitable for use in the paving work and that no more of it would be accepted. Under the terms of the contract it was the duty of the inspectors and engineers to see that the work was done in accordance with the specifications. If these officers had permitted this gravel to be used after they had found it unsuitable they would have been guilty of culpable neglect of duty. Even had they consented to the use of gravel not up to the requirement of the specifications such consent would not have bound the State, the contract specifically providing it should not do so. It is not claimed that the inspectors and engineers acted either arbitrarily or corruptly in refusing to accept any more of the gravel, but simply that their action lessened the profits which claimants would otherwise have made. A sufficient answer to that is that they are not entitled to profits made by the use of bad material. Claimants admit the com-

pleted job was accepted and paid for by the State. That being true they are entitled to no more compensation on account of that contract.

Section 19 of Article 4 of the Construction provides: ''The General Assembly shall never grant or authorize extra compensation, fee or allowance to any public officer, agent, servant or contractor, after service has been rendered or a contract made,'' etc. This language is clear and unambiguous and its purpose cannot be misunderstood. It was adopted by the people for their protection against claims such as this. ''Extra compensation is a payment or allowance in excess of that which was fixed by law or contract when the services were rendered.'' (*Porter* v. *Loehr*, 332 Ill. 353). Claimants have been paid all their contract called for. They performed no work other than that which their contract required them to perform, and this court has no power to award them extra compensation for that work.

The claim is therefore denied and the case dismissed.